BENCHCRAFT, INC., Riverside Furniture Corp., and Hickory Hill Furniture Company, A/K/A Crestline Furniture Company, Plaintiffs,

v.

BROYHILL FURNITURE INDUSTRIES, INC., Defendant.

Civ. A. No. WC 84–143–D–D.

United States District Court, N.D. Mississippi, W.D.

March 14, 1988.

Thomas D. Keenum, Sr., Booneville, Miss., N. Elton Dry, Pravel, Gambrell, Hewitt, Kimball & Krieger, Houston, Tex., Charles C. Garvey, Jr., Pravel, Gambrell, Hewitt, Kimball & Kreiger, New Orleans, La., Don A. Smith, Harper, Young, Smith & Maurras, Fort Smith, Ark., John W. Chestnut, Richard B. Hoffman, Tilton, Fallon, Lungmus & Chestnut, Chicago, Ill., for plaintiffs.

Floyd A. Gibson, Blas P. Arroyo, Bell, Seltzer, Park & Gibson, Charlotte, N.C., Dan W. Webb, Tupelo, Miss., for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

The three corporate plaintiffs in this action invoke the court's jurisdiction pursuant to 28 U.S.C. § 1338 and 28 U.S.C. §§ 2201 and 2202, and bring this action relating to a certain design patent issued by the United States Patent and Trademark Office. The plaintiffs challenge the validity of the subject patent and seek to have it declared invalid. The defendant has countersued, claiming patent infringement by the three plaintiffs.

Following entry of a pretrial order, this action was tried before the undersigned United States District Judge, sitting without a jury, in Oxford, Mississippi. Having considered the oral and documentary proof submitted at trial, the parties' pretrial memoranda, proposed findings of fact and conclusions of law, and supplementations thereto, the court now sets forth its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### I. BACKGROUND

#### A. The Parties

Plaintiff Benchcraft, Inc. ("Benchcraft") is a Delaware corporation having its principal place of business at Blue Mountain, Mississippi. Benchcraft's business involves the manufacture of upholstered furniture, including a suite or piece designated as style 4560. Plaintiff Riverside Furniture Corp. ("Riverside") is an Arkansas corporation, having a place of business at Fort Smith, Arkansas. Riverside also manufactures upholstered furniture, including a suite or piece designated as style 9553. Plaintiff Hickory Hill Furniture Company, a/k/a Crestline Furniture Company ("Crestline"), is a North Carolina corporation, having a place of business at Fulton, Mississippi. Crestline manufactures upholstered furniture, including a suite or piece designated as style 54737 and one designated as style 1201.

Benchcraft, Riverside and Crestline have continuously, since July 3, 1984, manufactured and sold the above-referenced styles of furniture. The three plaintiffs are each named as counter-defendants in the defendant's counterclaim.

Defendant/counterplaintiff Broyhill Furniture Industries, Inc. ("Broyhill"), is a North Carolina corporation, having its principal place of business at Lenoir, North Carolina. Broyhill is the owner of the patent in suit, United States Patent Des. No. 274,485. Broyhill manufactures both upholstered furniture and occasional furniture or "case goods" (end tables, coffee tables, bookcases), including a suite or piece designated as style 7663.

#### B. The Patent in Suit

This action relates to the validity of United States Patent No. Des. 274,485 (the '485 patent or the "patent in suit"). The application for the patent in suit was filed on May 19, 1983 and subsequently issued on July 3, 1984. Gary A. Huffstetler ("Huffstetler"), an employee of Broyhill, is the named inventor of the patent in suit (Plaintiff's Trial Exhibit 1 or "PTX-1"). Huffstetler assigned his rights in the patent to the defendant Broyhill.

The patent in suit discloses an ornamental design for a suite of upholstered furniture which is depicted in Figures 1 and 2 of

the patent in the form of a sofa and love-seat. PTX–1. The claim of the patent is: "The ornamental design for a seat, as shown and described." PTX–1.

C. Origin of the Patent in Suit

This lawsuit and the patent had their genesis in certain acts which occurred in mid–1982. In May 1982, two corporate officials of Broyhill, namely its president Mr. Carl E. Gunter ("Gunter") and vice-president Mr. Ken Kepley ("Kepley"), made a trip to London, England to attend the Earls Court Furniture Show.

At this show, Gunter and Kepley observed a Victorian style furniture suite manufactured in Italy by a Mr. Zampa Bruno ("Zampa"). The suite, referred to as a "Venezia suite", was purchased by Mr. Joseph Alfred Spicer ("Spicer") of Ideal Furniture Co., Ltd., sometime in late 1980. Spicer testified by deposition that he displayed the piece at the Earls Court Show in 1982. Zampa testified by deposition that he had circulated photographs of the Venezia suite to prospective customers probably as early as 1977 or 1978, although he could not recall the exact date.

Mr. Gunter testified that when he first saw the Venezia suite he realized that it was not appropriate for the United States market. He was interested, however, in certain aspects of the Venezia piece, including the height of its back, the general shape of the back of the piece, and the "aesthetic flow" of the back, which "triggered an interest" on Gunter's part. Accordingly, Gunter photographed the Venezia suite with a Minox brand miniature camera which he often carried along with him to furniture shows.[1]

In London, Gunter also instructed an employee of Broyhill, U.K., a marketing entity of Broyhill in England, to acquire a piece of the Venezia suite for shipment to Broyhill's United States plant. Gunter testified that he believed that certain features of the Venezia suite might be translated into a new upholstered furniture design that could be successfully marketed in the United States.

Immediately upon their return to Broyhill's plant in North Carolina, Gunter and Kepley met with Mr. Gary Huffstetler and Mr. Eric Stuenkel, both of whom were furniture designers employed in Broyhill's design department, to describe what they had seen at the Earls Court Show. Gunter testified that he informed Huffstetler that Gunter and Kepley had seen a product at the Earls Court Show which would be a desirable and probably successful product for Broyhill to begin manufacturing. Gunter and Kepley described the Venezia suite to Huffstetler and Stuenkel in general terms, relating to the shape and height of the Venezia sofa. They also meticulously pointed out such features as the outline of exposed wood on the back, the "T-cushions" on the seat, and used such phrases as "barrel back," "pub back", and "hand-tufted back" to recreate in words the back treatment on the Venezia sofa. After he and Kepley had described the Venezia sofa from memory, Gunter testified that he then suggested with some urgency that Huffstetler apply himself toward developing a design incorporating the features which had been described to him.

Huffstetler testified at trial that he had no idea in 1982 what was meant by the term "barrel back", but that he clearly understood that he was to produce a "version" of the sofa which had been described to him and Stuenkel by Gunter and Kepley. Huffstetler commenced immediately to create a design as requested and, as was his usual practice, made sketches of different parts of an upholstered sofa as he visualized how that part would appear in the finished design. Huffstetler and Stuenkel showed their preliminary sketches to both Gunter and Kepley, who critiqued their efforts and suggested changes. These unsatisfactory early sketches were later discarded by Huffstetler and Stuenkel.

Huffstetler and Stuenkel continued their design efforts while the Gunter photo-

---

1. These photographs, referred to herein as the "Gunter photographs" (and admitted into evidence as Plaintiffs' Trial Exhibit 5, "PTX–5"), played a significant part in the ensuing events which led to this lawsuit.

graphs were away in New York for developing. Both Gunter and Huffstetler tetified that Huffstetler's design was essentially complete before the Gunter photographs were returned from New York and seen for the first time by Huffstetler. However, before he saw the photographs, Huffstetler had not been able to complete a sketch which Gunter or Kepley found totally satisfactory.[2] Rather, Huffstetler testified that he used the Gunter photographs to verify or clarify his earlier rough sketches, especially some problems with the wings on his piece "drooping" and not being as "crisp" as Kepley desired them to be. Huffstetler testified that he added from the photographs a nail trim around the exposed wood stub panels on the arms of his sofa and two rows of thirteen buttons, identical in number to those seen on the Venezia sofa. PTX–5.

Huffstetler showed his completed sketch, PTX–4, to Kepley, who indicated that Huffstetler had finally captured the essence of the piece desired by Gunter and had in fact "hit it on the nose."[3] Huffstetler's completed design sketch was next rendered by Stuenkel into a full-sized engineering frame drawing which was sent to Broyhill's sample shop for the construction of a sample. Huffstetler's original design, designated by Broyhill as Model No. H–40, was a somewhat formal piece of furniture having tufts in the kidney roll and a plain or straight skirt with box pleats. The piece also had a dark wood trim and was covered in a heavy jacquard fabric. When the sample was delivered from Broyhill's sample shop on July 30, 1982, the Model H–40 sofa piece was assigned Style No. 7503 ("the 7503") by Broyhill. The 7503 was first offered for sale in the fall of 1982 in the traditional category.

Mr. Larry Waggoner, a regional sales manager for Broyhill in 1982, testified at trial that he and other sales personnel were dissatisfied with the look of the 7503 sofa. Waggoner was of the opinion that the piece was too formal and the jacquard fabric application raised the price beyond Broyhill's usual price range. Thus, Waggoner, Kepley and Gunter suggested that a "country" version of the 7503 be developed, since the country look was at that time and presently continues to be a very popular style in the furniture industry.

Huffstetler worked up some sketches giving what he considered to be a "country" look to the 7503 and necessary changes were then directed to be incorporated into a second sample. This country version of the 7503 was designated as Model No. H–40A and assigned Style No. 7663 ("the 7663"). As distinguished from the 7503, the 7663 sofa was covered in a "ditsy" country print fabric (PTX–78); the exposed wood was changed from gum to light oak with a lighter finish; a gathered or shirred skirt and kidney roll effect treatment replaced the more traditional box pleat skirt; and ruffled bolster pillows were added. While Huffstetler and/or Stuenkel drafted the design of the 7663, PTX–44 and PTX–45, neither had any part in the selection of the wood species or the type of fabric used to cover the 7663.

The Broyhill 7663 sofa and its accompanying loveseat and chair (Style Nos. 7661 and 7660) were introduced to the pre-market in August 1982 and were met with almost immediate acceptance by Broyhill's customers. As Mr. Gunter testified, when sales of the 7663 sofa "took off", Broyhill officials then considered the possibility of obtaining a patent on the design because of its popularity and the fact that it apparently had "caught everyone's eye." In contrast, the sales of the 7503 were unremarkable and this style was eventually dropped by Broyhill.

2. Huffstetler acknowledged that as he and Stuenkel developed the design for the sofa Gunter and Kepley had requested, that as designers Huffstetler and Stuenkel "had in mind", and may have reviewed "tear sheets" or ad slicks of various pieces of furniture already in existence at that time, and that they showed some of this printed material to Gunter and Kepley to ascertain whether it represented "the direction they should go" with their design efforts.

3. It is noteworthy that Huffstetler indicated that he only required one to one and one-half additional hours of drafting to produce an acceptable design drawing once he had seen the Gunter photographs.

A catalog sheet having a photograph depicting the 7660 group (the sofa and loveseat) was sent to Mr. Donald J. Fitzpatrick ("Fitzpatrick"), the in-house patent and trademark attorney for Broyhill's parent corporation, Interco. PTX–46 and PTX–48. These photographs were provided to a patent draftsman who substantially reproduced the design depicted in the catalog sheet as Figures 1 and 2 in the patent application. PTX–2.

## II. PROSECUTION OF THE PATENT

### A. Actions of the Patent Attorney

Mr. Fitzpatrick testified at trial that he is responsible for all patent and trademark work for Interco and all its subsidiaries and has been since approximately 1980. He maintains a liaison person with each subsidiary of Interco, including Broyhill, from whom patent questions or problems are referred to Fitzpatrick. The liaison for Broyhill is Mr. E.D. Beach, vice-president of finance for Broyhill. Mr. Beach testified by deposition that he was the first Broyhill official to contact Fitzpatrick regarding a patent on the 7663 design and that the first contact made with Fitzpatrick was sometime in the fall of 1982.

Fitzpatrick testified that in 1982 he had developed no formalized procedure for becoming aware of an inventor's knowledge of the prior art relevant to his invention. In practice, Fitzpatrick would merely communicate with his liaison person or the actual inventor to collect the pertinent disclosure documentation necessary for preparation of the patent application. Since 1982, Fitzpatrick has developed a procedure for collection of such information, including a detailed disclosure form for prior art.

Fitzpatrick testified that his experience with trademark and patent law began almost immediately upon his graduation from law school in 1967, when he was employed with Bethlehem Steel Corporation as a patent trainee. In 1970 he went to work for Airco, Inc. as a patent attorney, where he remained employed until June of 1974. From June 1974 until 1979 or 1980, Fitzpatrick was employed as a patent and trademark attorney with Monsanto Company. In February 1980, Fitzpatrick became employed as a trademark and patent attorney with Interco. During his 15 years of patent experience prior to 1982, Fitzpatrick testified that he had never prepared a design patent application.[4]

When Fitzpatrick received certain disclosure information relative to the desired 7663 design patent in late 1982, he forwarded same to Ms. Edna Bloch to obtain patent drawings. PTX–54. These drawings were provided to Fitzpatrick in February or March of 1983. Once he obtained the patent sketches, Fitzpatrick sent the prepared patent application to Beach at Broyhill, requesting that Beach have the inventor, Huffstetler, read and sign the application. Fitzpatrick testified that he did nothing to ascertain whether either Beach or Huffstetler knew the meaning of the various oaths contained in the patent application or whether they understood the legal effect of the matters contained in the application.

In point of fact, Fitzpatrick did not meet directly with or otherwise consult with the inventor, Huffstetler, about the application or the declarations contained therein at any time prior to the filing of the application except for one telephone conversation. Huffstetler testified that the patent in suit was his first experience with a patent application. He also testified that he had no prior knowledge of patent procedures and that, although he signed the oaths in the patent application, he did not fully understand either their meaning or their legal significance.

Fitzpatrick testified that when Interco acquired Broyhill in approximately 1981 he did visit Broyhill's previous patent attorney, a Mr. Rhodes, in Greensboro, North Carolina, where Fitzpatrick reviewed some

---

**4.** Notwithstanding his lack of experience with design patents, Fitzpatrick consulted with no outside counsel nor sought any assistance in the preparation of the application for the patent in suit. As Fitzpatrick testified, he considered a design patent "so easy" and "so simple", he perceived no need for assistance. It was only later upon the filing of the Petition to Make Special that Fitzpatrick conferred briefly with additional counsel.

40 files of issued design patents and pending patents for case goods. Based on his review of this outside counsel's files, Fitzpatrick made the assumption that Broyhill personnel were experienced in design patent matters and that it was unnecessary for him to inquire of Huffstetler whether he understood the patent application and declaration or whether there was prior art which should be disclosed. Fitzpatrick never in fact ascertained that any official or employee at Broyhill had the level of knowledge or experience which he imputed to and assumed them to possess. Fitzpatrick did not discuss either with Huffstetler or Beach any information concerning the prior art relative to the 7663 design. Thus, Fitzpatrick did not learn about the Gunter photographs or any other prior art from Huffstetler before filing the application on May 19, 1983.

By the time of the Fall Market in October 1983, several other manufacturers, including Benchcraft and Riverside, were showing and selling groups of upholstered furniture which closely resembled the design of Broyhill's 7663 style.[5] Defendant's Exhibits 7, 10 and 14 ("DX–7, DX–10 and DX–14"). Apparently, no other manufacturer offered for sale any group resembling the Broyhill 7503 sofa style, which was also displayed at that market.

Fitzpatrick notified these manufacturers by letter of Broyhill's pending patent application and stated that Broyhill considered these copies a "blatant act of infringement", as well as an act of unfair competition. PTX–55 and PTX–56. By December 1, 1983, Broyhill had also become aware of a Crestline group which closely resembled the 7663 style. Thus, Fitzpatrick also notified Crestline of Broyhill's pending application and restated his claim of infringement. Fitzpatrick also noted that Crestline's sale of its Style No. 1201 sofa to J.C. Penney & Company, to whom Broyhill had previously sold a version of its 7663, was considered an act of unfair competition. PTX–57.

The only response Broyhill received to its notification of the pending patent application was from Crestline, which argued in effect that there could be no infringement of a pending patent application until the patent issued. PTX–58.

After he was notified of these alleged infringing acts, Fitzpatrick prepared a Petition to Make Special for the patent in suit. A Petition to Make Special requests that the Patent and Trademark Office ("PTO") give a patent accelerated consideration for any of several reasons.

Generally, patents are reviewed in chronological order based on their filing date. 37 C.F.R. § 1.101 (1986). One basis for a Petition to Make Special, as set forth in the Manual of Patent Examining Procedure ("MPEP") utilized by PTO examiners, is an allegation of infringement against a pending application. MPEP, § 708.02, II. (1983). Although the MPEP is neither binding law nor regulation of the PTO, it is utilized almost universally by both PTO examiners and patent attorneys in their everyday practice, according to the testimony of plaintiffs' patent law expert Professor Donald Chisum, a recognized scholar and author of a treatise in the field of patent law. The MPEP is updated annually to reflect changes in interpretation of the patent law made by the PTO. Professor Chisum testified that annual updates of the MPEP are available at a nominal cost.

In preparing his Petition to Make Special for the patent in suit in November 1983, Fitzpatrick admitted at trial that he may have relied upon a 1973 edition of the MPEP. As a result of Fitzpatrick's apparent lack of knowledge of the prevailing rules before the PTO, his Petition to Make Special was initially denied on January 3, 1984 because he failed to include the necessary fee required for such special consideration. PTX–2. Upon reconsideration, the Petition to Make Special was granted on March 1, 1984. PTX–2. In filing his Petition to Make Special, Fitzpatrick engaged the services of Mr. Howard E. Russell to

---

**5.** As several of plaintiffs' witnesses testified, it is commonplace in the industry for manufacturers to copy each others' unpatented designs.

conduct a search of the prior art pertinent to the 7663 design sought to be patented.[6] Russell provided his search results to Fitzpatrick on or about October 18, 1983. PTX–52.

Fitzpatrick prepared and signed as attorney for Huffstetler an affidavit which set forth that the novel elements of Huffstetler's design, namely the combination of an exposed wood portion and the hand tufted back, were not suggested by the prior art.[7] PTX–2. Fitzpatrick testified at trial that the representations he made in this affidavit filed in support of his Petition to Make Special were not based on any interview or direct communication with the inventor, Huffstetler. Thus, Fitzpatrick was not made aware of any prior art references which Huffstetler himself may have relied upon either for inspiration or derivation of his design. Also, included in the alleged prior art about which Fitzpatrick did not inquire during his prosecution of the patent in suit are the Gunter photographs, which Huffstetler admittedly used to "verify and clarify" his supposedly novel design.[8]

Huffstetler testified in his deposition that he considered the Gunter photographs material to the development of his design. Huffstetler testified at trial that Fitzpatrick never explained to him either the extent of his duty of disclosure or the meaning and effect of the oath which Huffstetler signed both on the original patent application and on the Petition to Make Special. Huffstetler also testified that Fitzpatrick did not provide him with a copy of the document styled "Amendment A" in the prosecution history of the patent in suit, PTX–2, which includes the prior art references in the form of patents which were asserted to be the most relevant to the 7663 design. Had Huffstetler seen Amendment A before it was filed with the PTO, he might easily have added the Gunter photographs and any other prior art he deemed material, assuming Fitzpatrick had at that time explained to Huffstetler the legal interpretation of "material".

### B. The Present Litigation

The patent in suit issued on July 3, 1984. Each of the manufacturers known to Broyhill to be selling groups of furniture similar to or embodying the patented design, including the three plaintiffs, were notified on or about July 9, 1984 of the issuance of the patent and Broyhill's continuing claim of infringement.

The Broyhill design depicted in the patent in suit has been imitated or copied by at least eighteen manufacturers in addition to the three plaintiffs. Mr. Gunter testified that Broyhill has settled its claims against many of these manufacturers, with the manufacturers agreeing to discontinue production of the accused furniture groups and paying damages to Broyhill for alleged past infringement. Broyhill has to date granted no licenses for continuing manufacture of the patented design to any furniture manufacturer.

6. Professor Chisum testified that a Petition to Make Special places a special duty of candor on the attorney preparing same. The MPEP provides that when filing a Petition to Make Special based on infringement, the petition must be "supplemented by an affidavit or declaration of the applicant's attorney or agent to show ... (5) that he or she has made or caused to be made a careful and thorough search of the prior art and has good knowledge of the pertinent prior art...." MPEP, § 708.02, II.(5) (1984); *see also*, MPEP, § 708.02, VIII.(d) and (e) (requiring disclosure of references most closely related to claim and distinguishing of prior art from the claimed invention for special examination of new application.)

7. Under § 708.02, VIII.(d), the applicant or his attorney must comply with 37 C.F.R. § 1.111

and indicate the patentable novelty which he believes distinguishes his design from the prior art. Fitzpatrick set forth his assessment of the patentable novelty of Huffstetler's design at pages 1–3 of Amendment A. PTX–2.

8. The court notes that Fitzpatrick's description of an exposed wood portion and hand tufted back, set forth in the affidavit supporting his Petition to Make Special, PTX–2, could easily also describe the Venezia sofa depicted in the Gunter photographs, PTX–5. Since Fitzpatrick signed the affidavit filed with the Petition to Make Special as Huffstetler's agent, the court finds no reason not to impute Huffstetler's knowledge of the Gunter photographs to Fitzpatrick, who had every opportunity to communicate with Huffstetler about relevant prior art before filing the Petition.

The three plaintiffs filed this declaratory judgment action on July 17, 1984, contending that the '485 patent is invalid and unenforceable and therefore not infringed by them. The three plaintiffs continued to sell their accused groups of furniture up to and through the time of trial of this case. Broyhill timely filed its counterclaim asserting willful infringement by the three plaintiffs.

The plaintiffs contend that the patent in suit is invalid and unenforceable on several grounds: 1) based on the prior art, the patent is invalid due to obviousness; 2) based on his derivation of the patented design from prior art references, Huffstetler did not himself "invent" the patented design; and, 3) based on inequitable conduct committed in the prosecution of the patent in suit before the PTO, the patent should be deemed invalid and/or unenforceable.

## III. PRIOR ART AND DERIVATION OF THE PATENT IN SUIT

The court must make factual findings in order to rule upon the allegations set forth by the plaintiffs. As the United States Supreme Court held in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the analysis of the obviousness issue under 35 U.S.C. § 103 requires a determination of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art. *Id.* at 17, 86 S.Ct. at 693, 15 L.Ed.2d at 556. These are factual findings which will enable the court to ultimately reach its legal conclusion on the question of obviousness and validity of the patent in suit.

### A. Prior Art

Before determining the scope and content of the prior art, the court must first determine what items in fact constitute the prior art. The parties placed before the court at trial several articles of alleged prior art which were not presented to nor considered by the PTO in its examination of the patent in suit. In considering the status of these matters as prior art relevant to the patent in suit, the court adopts the view that prior art is properly construed as anything in tangible form that may properly be relied upon by the PTO in patent cases in support of its rejection of the patent. *See Borden, Inc. v. Occidental Petroleum Corp.*, 381 F.Supp. 1178 (S.D. Tex.1974). Prior art may thus take the form of other patents, printed publications, and actual pieces of furniture that were in the public knowledge or in public use or sale more than one year prior to the filing date of the application. 35 U.S.C. § 102.

The court finds that the following are relevant and pertinent prior art in relation to the patent in suit:

### 1. *The Zampa Venezia Ad Slick Photograph*

The plaintiffs argue that the ad slick photograph of the Zampa Venezia photograph, PTX–9, qualifies as prior art under 35 U.S.C. § 102(a), § 102(b), or both. None of the testimony on this issue offered at trial came from live witnesses. In fact, the only testimony the three plaintiffs offered in support of their assertion that PTX–9 qualifies as a printed publication under § 102(b) was the deposition testimony of Joseph Spicer ("Spicer") and Zampa Bruno ("Zampa").

Broyhill argues that this oral testimony, unsupported by relevant, contemporaneous, corroborating documentary evidence, cannot meet the clear and convincing burden of proof which plaintiffs must bear.

The court notes that while oral deposition testimony is probably not the most favored means of proving the existence and prior art status of a printed publication under Section 102(a) and 102(b), such testimony can be sufficient if it is strong, clear and convincing and corroborated by contemporaneous correspondence or other dated records. *See Galland–Henning Mfg. Co. v. Dempster Brothers, Inc.*, 315 F.Supp. 68, 81–82 (E.D.Tenn.1970).

Zampa testified that he distributed copies of PTX–9 to prospective customers in England, Germany and Australia prior to

1982, probably as early as 1977 or 1979. Spicer testified by deposition that he had ordered the Venezia suite from Zampa probably as early as 1980, and he offered invoices as evidence of his purchase from Zampa of the Venezia suite. Spicer also testified that the Venezia suite which he purchased from Zampa was in fact the suite which he displayed on behalf of Ideal Furniture at the Earls Court Show in May 1982, and which was photographed by Mr. Gunter. These facts, considered in their entirety, persuade the court that plaintiffs have met their burden of showing by clear and convincing evidence that the Zampa Venezia ad slick photograph, PTX–9, qualifies as a printed publication under the requirements of 35 U.S.C. §§ 102(a) and 102(b).[9]

### 2. *The Zampa Venezia Sofa*

█ It is undisputed that Gunter and Kepley viewed the Venezia suite at the Earls Court Show in London some time in May 1982. Gunter photographed the sofa and both Gunter and Kepley later described the sofa in detail to Huffstetler so that Huffstetler might create a "version" of the sofa. The sofa which Gunter and Kepley viewed was clearly and convincingly the same sofa depicted in PTX–9. Thus, the court finds that the Zampa Venezia sofa, a copy of which was reproduced for trial as PTX–101, was in existence for more than one year prior to Huffstetler's alleged invention of the patented design and qualifies as prior art to the patented design.

### 3. *The Gunter Photographs*

█ There was much dispute at trial over whether the Gunter photographs could properly be characterized as a "printed publication" form of prior art. Broyhill argued strenuously at trial that the photographs do not meet the general and usual

definition of a printed publication, apparently suggesting that a printed publication must be something in writing or depicting at least a modicum of information. The court is of the opinion that photographs of a certain furniture design, given that overall external ornamental appearance comprises the essence of the design, are sufficient to constitute printed publications in the furniture design field.[10] Accordingly, the court finds that the Gunter photographs, which Huffstetler admittedly required as a necessary reference to complete his design of the patent in suit, are printed publications meeting the qualification of prior art as to Huffstetler.

As Mr. Eric Stuenkel, the draftsman who worked closely with Huffstetler in developing the design of the patent in suit, testified at trial, it was the Gunter photographs which allowed Huffstetler to do what he had been unable to do before seeing the photographs: to create a sketch acceptable to Messrs. Gunter and Kepley which incorporated the design of the sofa they had seen at the Earls Court Show in London.

### 4. *The Benchcraft 4540*

Broyhill admits that the Benchcraft style 4540 sofa, PTX–15, was manufactured and offered for sale as early as April 1982, more than one year prior to the filing date of the application for the patent in suit. *See* PTX–18 and PTX–19. Thus, the court finds that the 4540 is prior art under 35 U.S.C. Section 102(b).

### 5. *Miscellaneous Prior Art*

█ In addition to the above items, Huffstetler admitted at trial that it was well known in the furniture industry that alternate skirt treatments, such as those shown in the Conover Colonial Catalog, at page 8, PTX–20, could be readily interchanged as desired to achieve different

---

9. The court also notes that limited dissemination of the PTX–9 photographs is not determinative of its status as a printed publication. Insofar as the court finds that the photograph reached members of the trade interested in the furniture suite, the court holds that this is sufficient dissemination of the photograph to satisfy the requirement of a printed publication. *Cf. Potter Instrument Co., Inc. v. Odec Computer*

*Systems, Inc.,* 499 F.2d 209 (1st Cir.1974); *Galland–Henning Mfg. Co., supra,* at 81.

10. This fact is confirmed by the claim of the patent which relies solely on the patent drawings to set forth the patented subject matter. PTX–1.

"looks" on furniture, including traditional and country looks as depicted between the 7503 style and the 7663 style. Additional items of prior art include Broyhill furniture styles 7233 (PTX–26), 7253 (PTX–28) and 3973 (PTX–33), each of which illustrates the use of ruffled or shirred skirts and ruffled-edge bolster pillows.[11]

█ Further, the prior art also includes the various patents and publications cited to the PTO during the prosecution of the patent in suit which include:

Des. 76,534 Graham
Des. 76,862 Faris
Des. 86,820 Anderson
Des. 89,728 Tavis
Des. 97,253 Berth
Des. 237,435 Kaplan
Des. 238,634 Winrow
Des. 249,754 Nash, Et Al.
Des. 250,864 Eisen
Des. 253,262 Brooks
Des. 256,634 Nash
Crestline Catalog, Vol. 20, 1976,
 Page 5, Loveseat No. 38815
K–Chair Company Catalog, 1973,
 Page 9, Loveseat No. 740

**B. Scope and Content of Prior Art and Derivation of Patent in Suit**

The scope and content of the prior art relevant to the patent in suit includes various sofas of different designs, each incorporating one or two of the design features of the patented design. The prior art must be viewed from the perspective of what it alone would teach, suggest or render apparent (i.e., "obvious") to a mythical person of ordinary skill in the art to which the subject matter of the patent pertains. 35 U.S.C. § 103. The relevant inquiry in the case *sub judice* is whether the prior art would render the patented design obvious to the furniture designer of ordinary skill. This determination requires the court to consider the differences between the patented design and the prior art as well as the level of skill of the fictional "person having ordinary skill in the art", 35 U.S.C. § 103, and also whether what the person of ordinary skill would learn from the prior art references noted above would render the patented design obvious.

**1. *Differences Between Prior Art and Patented Design***

The patented design incorporates various design features of elements in a combination comprising a blend of Victorian and country elements. Among these are included the high back of the 7663 design, the curved wing treatment on the arms of the sofa, the shirred skirt and bolster pillows, the application of lightweight "ditsy" print cotton fabric, exposed wood arm stumps and exposed wood back rail, and a semi-attached back. Each of these design elements or features was known in the furniture design field prior to the alleged invention of the patented design.

Broyhill argues that one distinctive feature of the patented design which was not known in the furniture design field prior to Huffstetler's invention was the use of a shirred kidney roll on a piece of country style furniture. Plaintiffs contend that while a shirred kidney roll may not have appeared on a country piece before Huffstetler's design, shirred kidney rolls were known in the industry and did appear on contemporary or traditional pieces prior to Huffstetler's invention. Huffstetler himself testified that he had never seen a shirred kidney roll on any style of furniture. The court finds that Huffstetler did invent this one aspect of the patented design (i.e., a shirred kidney roll).

Accepting that all the above-mentioned features or elements of the patented design except for the shirred kidney roll were known in the industry prior to the application for the patent in suit, the only crucial and novel feature of the patented design was the combination of these elements and the use of a shirred kidney roll on a country style piece. Nowhere in the prosecution history of the patent is the shirred

---

**11.** None of these items were cited to the PTO, although they were admitted by Huffstetler as having been contained in Broyhill's design department "library" or "morgue" of prior furniture designs.

kidney roll suggested as a distinguishing feature which sets the patented design apart from the prior art.

Mr. Fitzpatrick sets forth in his Amendment A, filed in support of the Petition to Make Special, that the combination of the exposed wood portion and hand tufted back is a feature not suggested by the prior art. Fitzpatrick also asserts that the design "represents an advance in the design field for such articles by presenting a new and ornamental appearance not suggested, even remotely, by the prior art." PTX–2.

Even though Broyhill's trial witnesses focused on the shirred kidney roll as a novel and distinctive feature of the patented design, this feature was not pointed out to the PTO examiner in Amendment A as a key feature of Huffstetler's design. As Broyhill's own patent law expert Mr. Dalbert Shefte testified, Fitzpatrick could have asked the PTO to include a "characterized by" clause in his description of the patented design to make clear that the shirred kidney roll was identified as the novel feature of the patented design distinguishing it from the prior art.[12]

### 2. Level of Skill of Person of Ordinary Skill in the Art.

Based on the testimony of the two expert witnesses who testified in the area of furniture design—Mr. Roland Carter for plaintiffs and Professor Vincent Foote for defendant—the court finds that a person of ordinary skill in the art of furniture design would have at least a high school education and some minimal training or experience in the art of designing generally, coupled with some basic artistic sensitivity or artistic ability. Professor Foote, who teaches in the School of Design at North Carolina State University, testified that the person of ordinary skill would also have under-

gone some form of apprenticeship either through additional education beyond high school or through intensive on-the-job training.

Mr. Carter, who identified himself as a freelance furniture designer with over 36 years experience in the field of furniture design, testified that the person of ordinary skill in the area of furniture design would likely also possess some ability to ascertain whether a particular piece of furniture is aesthetically pleasing and why it is pleasing. Carter also testified that the goal of the designer of ordinary skill is to create a "saleable" item, i.e., something unlike what is already on the market but which is of interest to the consuming public.

### 3. Obviousness of the Design to Person of Ordinary Skill

The plaintiffs suggest that when the prior art references noted above are combined, particularly the Zampa Venezia design and the Benchcraft 4540 along with the "country look" of the Broyhill 7233 and 7253, the differences between the patented subject matter of the '485 patent and the prior art are such that the subject matter as a whole would have been obvious at the time of invention to the person of ordinary skill in the art of furniture design.

Mr. Carter testified that in his opinion the patented design is obvious when one considers what is taught by the prior art. To illustrate his opinion, Carter prepared a set of "overlay" drawings showing a direct progression from the Venezia sofa and the Benchcraft 4540 to the patented design and depicting an alleged inherent suggestion of combining the back of the Venezia sofa with the Benchcraft 4540.

As Carter noted, it would have been obvious to a person of ordinary skill to length-

---

**12.** The court notes that had Mr. Fitzpatrick interviewed or consulted closely with the inventor, Huffstetler, about his design Fitzpatrick quite possibly would have learned that Huffstetler considered the shirred kidney roll as *the* unique and novel feature of the patented design. Equipped with this knowledge, Fitzpatrick could have requested from the PTO examiner or could have included in the patent application a "characterized by" clause addressed to the shirred

kidney roll in order to further distinguish the patented design from the prior art. Although a design patent may "be treated as claiming items necessarily implied even if not expressly claimed", *Transmatic, Inc. v. Gulton Industries, Inc.,* 601 F.2d 904, 912 (6th Cir.1979), a patent owner or assignee may not broaden the scope of a claim already adjudicated. *See KSM Fastening Systems, Inc. v. H.A. Jones Co., Inc.,* 776 F.2d 1522 (Fed.Cir.1985).

en the Venezia sofa for the American market, to replace the exposed legs of the Venezia sofa with some kind of skirt treatment, and to have replaced the intricate carved back rail on the Venezia with an appliqué. Carter also suggested that the wood carving appliqué on an exposed wood rail is also suggested by Broyhill's own style 7233 (PTX–26). These changes illustrated by Carter would, he testified, lead one to a "natural evolution" of the patented design.

Plaintiffs also argue that Huffstetler's comment when he first viewed the Benchcraft 4540 in October or November of 1982 that someone had "knocked off" his design of the 7663 is evidence of the inventor's recognition of the similarity between his design and the 4540 style.

Professor Foote took a somewhat different tack in explaining his opinion that the design of the patent in suit would not be obvious to one of ordinary skill in the art of furniture design. Foote testified that there is no suggestion in the prior art for combining the various design features or elements comprising the patented design, especially the combination of Victorian and country style furniture elements. Foote further testified that he found no "flaws" in the prior art and that, in his opinion, nothing in the prior art would suggest to any designer of ordinary skill that any of the prior art designs should be changed, modified, or combined in order to create a new or different design. In his opinion, Foote stated, the patented design incorporates elements which make it a totally and completely different design from any of the prior art references and a design which would not be obvious to the designer of ordinary skill in the art of furniture design.[13]

In determining whether a design would have been obvious to a designer of ordinary skill in the art, the relevant time period is the time at which the invention is made. The court should not and may not utilize hindsight to hold that because a design is obvious now, it must have been obvious at the time of invention. See Application of Oelrich, 579 F.2d 86 (C.C.P.A.1978); Clopay Corp. v. Blessings Corp., 422 F.Supp. 1312, 1321–1322 (D.Dela.1976). The court must ascertain whether any non-obvious differences exist in the patented design which did not exist in the prior art at the time of Huffstetler's alleged invention.

The court is of the opinion, as set forth more fully in its conclusions of law below, that the unique combination[14] of country and Victorian elements in one piece of furniture render the patented design, considered as a whole, non-obvious. Cf. Peterson Mfg. Co., Inc. v. Central Purchasing, Inc., 740 F.2d 1541, 1548 (Fed.Cir.1984). Only by use of impermissible hindsight with the teachings of the patented design in hand could one find that the patented design is obvious when considered alongside the prior art. See FMC Corp. v. Manitowoc Co., Inc., 654 F.Supp. 915, aff'd, 835 F.2d 1411 (Fed.Cir.1987). The distinct characteristics of country style furniture as compared to Victorian style furniture do not suggest any obvious combination of the two styles.

C. Secondary Considerations (Objective Indicia of Non–Obviousness)

1. Commercial Success

The undisputed testimony from Broyhill's witnesses was to the effect that when

13. Professor Foote also testified as to the visible physical differences between the Benchcraft 4540 and the Venezia sofa as compared to the patented design. These differences include:
(1) the straight formal back of the patented design as compared to the "double-curved" back of the 4540 (PTX–15); (2) the two-part division of the back of the 4540 and the absence of a kidney roll; (3) the box-pleat skirt on the 4540 viz-a-viz a shirred skirt on the patented design; (4) the tapered-down backrail curving into the arm of the Venezia sofa; (5) the exposed legs on the Venezia suite; and, (6) "bull-nosed" cushions on the Venezia in contrast to T-cushions on patented design.

14. In this connection, the court appreciates that the mere fact that all elements of a design may be individually well known in the relevant art does not prevent an inventive and unique combination of those old elements, which creates an overall novel appearance, from being patentable. See, e.g., Blumcraft of Pittsburgh v. U.S., 372 F.2d 1014, 178 Ct.Cl. 798 (1967); Application of Garbo, 287 F.2d 192 (C.C.P.A.1961); Application of Ward, 182 F.2d 1018 (C.C.P.A.1950).

the 7663 sofa [15] was introduced, it met with almost immediate commercial success. As Mr. Gunter testified, a "good" selling furniture frame may sell some 200 to 250 units per week in the sofa, loveseat and chair. At its peak, the 7663 frame was selling approximately 500–550 total units per week, and about 250 sofas per week.

Additionally, both Broyhill's witnesses and the plaintiffs' witnesses testified that the average "life" of a furniture design is only two to three years. That is, a style generally reaches its peak and then drops off to the point of becoming commercially unproductive in a period of two to three years. The patented design has continued to enjoy commercial success from its introduction in October 1982 through the present.

Gunter estimated that the 7663 was probably one of Broyhill's largest selling frames, if not in fact the most successful frame design ever for Broyhill. In gross sales, Broyhill has sold more than $30 million of the 7660 group embodying the patented design. Plaintiffs have sold some $27 million of the accused infringing groups between July 3, 1984 and December 31, 1986. Mr. Gunter testified that according to recent sales figures, the 7660 group was still selling an average of 401 total units per week for the period of September–October 1987. Gunter pointed out that Broyhill only requires sales of some 25 units per week to maintain a frame design in its product line.

Plaintiffs argue that the commercial success of the patented design is attributable to wood stain color, fabric material, fabric print, and other non-design factors such as price. Broyhill counters that the commercial success of the 7660 group is directly attributable to the merits of the patented design and the overall shape and pleasing appearance projected by the design, not to these other factors urged by the plaintiffs.

The testimony adduced at trial indicates that several factors may influence a consumer's decision to purchase a particular piece of furniture. Among these factors, according to the testimony of Mr. Gunter for the defendants and Messrs. Hugh McLarty, Keith Franklin, Lee Corson, and Norman Waxman for the plaintiffs, are included:

1) Fabric Application (i.e., the kind and color of fabric applied to the internal frame)

Mr. Waxman, who stated that he has worked for 28 years in the furniture industry and was at the time of trial employed as Chief Operating Officer for Corson Furniture Industries (the parent of Crestline), testified that in his opinion, fabric is the "number one item driving sales of furniture." Explaining his testimony, Mr. Waxman stated that companies or designers who are able to "wed" fabric with frames successfully are the most successful in the furniture business.

Mr. Corson testified that fabric is the first and foremost motivator of the buyer, adding that a good fabric can sell a weak frame and a strong frame design can be "killed" by a bad fabric.

The patented design, as sold by Broyhill and as copied or imitated by the plaintiffs, sold most successfully in the pattern known as "Memories Blue", PTX–78, a cotton "ditsy" print fabric which was also very popular on many other country style frames. Mr. Corson testified that according to a Crestline study, blue and natural blue cotton print fabric accounted for some 63% of the fabric on its sales on country style pieces.

2) Wood Treatment (i.e., wood species and stain used on the frame)

Mr. Gunter testified that in his opinion, the different wood utilized between the 7503 and the 7663 was in some respect responsible for the success of the 7663. Mr. Carter also testified that lighter wood stains and lighter wood species (e.g., oak instead of gum) are characteristic of country styles. Broyhill admits that the 7503,

---

**15.** Throughout this opinion the court has referred to the patented design and its commercial embodiment, the 7663 sofa, interchangeably. This is not to suggest that the court is unaware that the scope of the patent is controlled by the patent itself. PTX–1. However, for the sake of convenience, the court has adopted this synonymous nomenclature.

which utilized a darker wood stain and darker wood species, had little commercial success in comparison to the patented design, which utilizes oak wood and a light stain. The court thus finds that wood treatment was at least partially responsible for the success of the 7663 sofa.

### 3) Price

Mr. Gunter and Mr. Corson testified that the furniture industry is "price-sensitive" and that the price of a particular piece or group of furniture will have some effect on its overall success. Mr. Corson noted that the furniture industry is very price competitive and it is difficult for a company to lower its prices and remain economically viable because of the high percentage of fixed costs in the production of furniture.

Mr. Gunter testified that Broyhill's 7660 group sold in what he would characterize as the "low-side of the upper quadrant" in price range, or at the lowest end of the highest-priced products. Gunter explained that $1,000 would be considered the high-end or highest price for a sofa and that the 7663 retailed for $799–$899.

Mr. Corson testified that Crestline's Style No. 54737, PTX–67 and DX–11, the accused copy of the 7663, retailed for approximately $699. Corson also stated that for mass merchandisers (e.g., J.C. Penney & Company, Montgomery Ward, and others), the marketable price range for pieces of furniture is normally $399–$699, with $599 being about the average. Corson expressed his opinion that at $799, Broyhill's 7663 would "really slow down" in sales and that Broyhill could not have captured all the sales made by the plaintiffs because of Broyhill's higher price. The court agrees and accepts this as preponderating proof that price had some effect on the commercial success of the 7660 group.

### 4) Frame Design

Mr. Gunter testified that it was his opinion that the overall design of the 7663 was primarily responsible for its commercial success. He also stated, as did Professor Foote, that he considered fabric application as a part of the overall design of the patent in suit.

To explain this opinion, Gunter stated that fabric application is to some extent determined by or dictated by the frame design. Thus, some fabrics are not suitable for the shirring effect seen on the skirt and kidney roll of the patented design. The lightweight cotton print fabric applied to the commercial embodiment of the patented design was necessary to achieve the shirring effect. Gunter also stated that the heavy jacquard fabric which was used on the 7503 would not have been suitable or adaptable to the country look sought in the 7663. Thus, Gunter suggested that fabric was a necessary and integral part of the design of the patent in suit because only a certain type of fabric would achieve the desired aesthetic effect of the patented design.

Professor Foote testified on cross examination that he agreed with the opinion that fabric is a part of the design of the patent in suit and that, in his opinion, the fabric application does contribute to the commercial success of a furniture piece.

The plaintiffs argue that fabric material, fabric print, fabric color or color of wood trim are not a part of the patented design and that these elements, even if they were responsible to some extent for the success of the 7663, cannot be considered by the court.

Having considered all the testimony and evidence, the court finds that all of these various factors noted above (fabric application, wood applications, price, frame design) had *some* effect on the commercial success of the patented design. Neither party has shown by a preponderance of the evidence that any one of these factors, singularly, was directly and solely responsible for the enormous commercial success enjoyed by the patented design. Nor has Broyhill convinced the court that the merits of the overall design, standing alone, are the complete explanation for the commercial success of the 7660 group.

In this connection, the court concedes that while it may in fact be true that some aspects of the fabric application are part of the design, this does not mean that color of fabric is part of the design. In the opinion

**1206**

of the court, the *type* of lightweight cotton print fabric necessary to achieve the shirred kidney roll effect and the shirred skirt effect on the patented design is dictated by the design and may perhaps be considered a part of the overall design.

In contrast, the court finds that *color* of fabric is not so dictated. It is undisputed that the "Memories Blue" fabric pattern sold very successfully not only in the patented design but also in several other country style pieces of furniture. Additionally, the court finds nothing within the claim of the patent itself, PTX–1, which would even suggest that a particular fabric pattern or color is necessary to achieve the patented design. The claim reads: "The ornamental design for a seat, as shown and described." PTX–1. Fabric application is nowhere implicated or inferable from the patent claim. Accordingly, the court finds that there has been no showing that commercial success was due solely to the design of the patent in suit. As one court has stated: "[T]he sweet smell of success, without more, is an uncertain indicator [of non-obviousness]; to be determinative, the aroma must waft proximately from the design...." *A. & H. Mfg. Co. v. Contempo Card Co., Inc.*, 576 F.Supp. 894, 900 (D.R.I.1983). Furthermore, it has been held that color cannot be appropriated as part of a design. *Funnelcap, Inc. v. Orion Industries, Inc.*, 421 F.Supp. 700 (D.Del.1976).

### 2. *Long–Felt but Unresolved Need and Failure of Others*

 In the context of this design patent, the court is of the opinion that the factor of long-felt and unresolved need is not a proper matter for consideration. This factor is more properly addressed to utility patents or mechanical patents which serve some functional purpose, where the court may more easily make an objective determination on this factor. *See Plantronics, Inc. v. Roanwell Corp.*, 403 F.Supp. 138 (S.D.N.Y.1975), *aff'd*, 535 F.2d 1397 (2d Cir.1976). Similarly, the court finds that failure of others is a difficult if not meaningless inquiry in the contemplation of a design patent because "evaluation of the patentability of a design is essential-

ly subjective and personal artistic tastes are unpredictable and inexplicable—one viewer's mural is another's graffiti." *Id.* at 160.

### 3. *Copying by Others*

 Broyhill asserts that the acts of the plaintiffs and at least eighteen other furniture manufacturers in copying the patented design is further evidence of the non-obviousness of the design. The evidence on this point is quite persuasive. Having made a close inspection of the plaintiffs' alleged copies of the patented design, the court finds that both the Benchcraft and the Crestline pieces, DX–5 and DX–11, respectively, are essential and almost identical copies of the commercial embodiment of the patented design. The distinguishing characteristics related to slight differences in wood stain, numbers of buttons and length or continuous nature of the back rail are, in the opinion of the court, no more than *de minimis* and insignificant distinctions. The proximity in time and in appearance of the Benchcraft and Crestline pieces to the design of the patent in suit is persuasive proof that the design had some degree of novelty.

 As to the Riverside piece, DX–8, the court finds that the overall aesthetic appearance of this piece is sufficiently different from the patented design such that the Riverside piece cannot be characterized as a copy of the patented design. The court is also impressed by the evidence of apparent contemporaneous independent development of the Riverside piece before any Riverside employees viewed the patented design.

In fact, the design drawing for the Riverside Style No. 9553, DX–8 was done by outside design personnel. PTX–63. Additionally, the court notes that the Riverside piece is somewhat smaller than the Benchcraft and Crestline pieces and the back of the Riverside piece does not have the high, Victorian "flair" seen in the patented design and the Benchcraft and Crestline copies.

Mr. Jerry Orler ("Orler"), vice-president of upholstery sales for Riverside, testified that Riverside commissioned the design group Otto & Moore to create the 9553 design so that Riverside would have a sofa to put into its existing case goods line known as the "Great Hill Road" collection. The ornamental designs both on the back rail and the wood arm stumps of the 9553, Orler testified, were intended to match the motif of the Great Hill Road collection. The wood finish on the 9553 matches that already on the various tables and other pieces in the Great Hill Road collection.

Thus, as to the plaintiff Riverside, the court finds that Riverside did not copy the design of the patent in suit. On the other hand, the court is convinced that plaintiffs Benchcraft and Crestline did copy the patented design. Particularly persuasive on this point is the fact that Benchcraft and Crestline admittedly had available prior art designs or alleged non-infringing substitutes which were not actively marketed while these plaintiffs continued to market their copies of the patented design.[16]

## IV. INVALIDITY OR UNENFORCEABILITY OF THE PATENT

Plaintiffs argue that, even assuming the patent in suit was valid when issued, it should be invalidated and/or deemed unenforceable because Broyhill committed "inequitable conduct" before the PTO by withholding or failing to disclose material prior art during the prosecution of the '485 patent. A claim of inequitable conduct sounds in fraud, but the term is given somewhat broader interpretation before the PTO. Inequitable conduct encompasses both affirmative acts of commission as well as acts of omission. *J.P. Stevens & Co., Inc. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1559 (Fed. Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). As recently clarified by the Federal Circuit Court of Appeals:

[O]ne who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO.

*FMC Corp. v. Manitowoc Co., Inc., supra,* 835 F.2d at 1415. Having found already that there are certain items of prior art which were in fact not disclosed to the PTO, the court must now consider whether Broyhill's non-disclosure rises to the level of inequitable conduct.

### A. Materiality of the Non–Disclosed Prior Art

An inventor and his patent attorney have a duty to disclose to the PTO during an application's pendency all information and prior art of which they are aware and which is material to the examination of the patent. 37 C.F.R. § 1.56(a). "Material" means all information where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *Id.* There are also more restrictive interpretations of "material", including an objective "but for" and a subjective "but for" test. The court elects here to apply the PTO's Rule 1.56(a) definition because it is the broadest test and is most closely aligned with how one applying for a patent should conduct business before the PTO. *J.P. Stephens & Co., supra,* at 1559.

The court finds that Fitzpatrick, as a registered patent attorney with more than 15 years of prior experience in filing and prosecuting patent applications, should have been well aware of his obligations of good faith and candor in dealing with the PTO as legal representative of his clients. Fitzpatrick himself testified that he has prosecuted several utility patents for his former employers, Bethlehem Steel, Airco, and Monsanto, and that he has been in-

---

**16.** As indicated above, however, copying is apparently quite customary in the furniture indus- try. *See* note 5, *supra.*

volved in three or four patent infringement lawsuits.

### 1. *The Gunter Photographs*

The inventor, Huffstetler, admitted on his deposition that during the pendency of his '485 patent application, he considered the Zampa Venezia photographs supplied to him by Gunter to be material. Although he testified at trial that he "messed up" on his deposition in stating his opinion that the photographs were material to his design, Huffstetler's actions with regard to the photographs, PTX-5, indicate his realization of the relevance of the photographs to his design.

One indication of Huffstetler's appreciation of the pertinence of the Gunter photograph is seen in the letter from Huffstetler to Fitzpatrick, dated August 28, 1984, with which Huffstetler sent the Gunter photographs to Fitzpatrick and indicated that they were "the photos of the sofa Mr. Gunter saw in Europe from which the inspiration for the 7663 was taken." PTX-8. It is curious that this letter, which Huffstetler indicates as including "the paperwork involved in the development of the 7663 sofa group", PTX-8, was not sent to Fitzpatrick until almost two months after the patent in suit had already issued. In his deposition, Huffstetler explained his interpretation of "material" to mean that if he had seen anything that would have given him an idea of a design element, he should present it. This definition, although admittedly not given with a complete legal understanding of the term, does in the court's estimation closely approximate the PTO's interpretation of "material."

There was considerable confusion at trial as to when Fitzpatrick himself actually became aware of the Gunter photographs. Plaintiffs argue that Fitzpatrick discussed the issuance of the patent with Gunter shortly before the issuance of the patent, at which time Fitzpatrick was advised of the existence of the photographs. Fitzpatrick himself testified that he did not learn of the photographs until some time after the patent had issued. Nevertheless, Fitzpatrick made no attempt once he learned of the photographs to seek a reexamination or to halt the issuance of the patent in suit so that the PTO examiner could consider the Gunter photographs. The only explanation for his actions Fitzpatrick offers is that he did not consider the photographs to be prior art or material prior art.

Since Huffstetler himself testified that the Gunter photographs depict the "inspiration" for his patented design and he also testified that he required the photographs to "verify and clarify" his design, the court finds that these photographs are material prior art which should have been disclosed to the PTO.

### 2. *The Benchcraft 4540*

Huffstetler testified that he and others at Broyhill were aware of the Benchcraft 4540 sofa as early as October or November 1982, long before the patent application was filed in October of 1983. Huffstetler testified that he viewed the 4540 in a Fingers Furniture catalog in late 1982, and after viewing the overall silhouette of the 4540, he thought that someone had "knocked off" his design of the 7663. Huffstetler testified that he was unaware that the Benchcraft 4540 had in fact predated his invention and could be considered prior art. Inasmuch as the inventor himself considered the Benchcraft 4540 a "knockoff" of his design, the court finds that the 4540 is material prior art.

As the plaintiffs assert, Fitzpatrick failed to make a thorough investigation of the prior art in connection with his prosecution of the patent. In connection with his filing of the Petition to Make Special, Fitzpatrick himself admitted that he conducted no independent search of his own, nor did he request Huffstetler or any other Broyhill representative to do a search of the prior art. Rather, Fitzpatrick relied on a minimum search performed by a patent searcher, Mr. Russell, which was limited to materials that are available in the PTO.

The plaintiffs contend, and Huffstetler conceded, that if an adequate search of Broyhill's own files containing catalogs of other manufacturers' pieces had been

made, the Fingers Furniture circular in which Huffstetler viewed the 4540 could have been discovered and the approximate introduction date of the 4540 ascertained. Had such a search been made, plaintiffs assert that Fitzpatrick would have learned that the Benchcraft 4540 had been on the market for more than one year prior to the filing of the patent application.

Plaintiffs contend and the court finds that the search conducted by Fitzpatrick was not the "thorough" search which Fitzpatrick represented had been made in his Petition to Make Special. The court is of the opinion that a search of relevant prior art which does not include a search of the inventor's own files and possible references in developing his invention could rarely meet the attorney's obligation, as suggested in the MPEP, to show "that he or she has made or caused to be made a careful and thorough search of the prior art or has a good knowledge of the pertinent prior art ..." MPEP, § 708.02, II.(5) (1983). Additionally, the court notes that since the patented design is in essence a novel combination of the Zampa Venezia and the 4540, materiality of these references can hardly be denied.

## B. Intent

Inequitable conduct also requires proof of a threshold intent, however, that intent need not be proven with direct evidence. *J.P. Stevens, supra,* 747 F.2d at 1560. The threshold intent may be proven by showing acts the natural consequence of which are presumably intended by the actor. *Id.* Proof of deliberate scheming by the patent applicant or his agent or representative is not required—gross negligence is sufficient. *Id.*

Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of the withheld reference. *J.P. Stevens, supra,* at 1560; *Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed.Cir.1984). On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient to support an allegation of inequitable conduct. An applicant accused of inequitable conduct may make "an effort to convince the fact-finder that the failure to disclose was nonetheless not due to an intent to mislead the PTO...." *FMC Corp., supra,* 835 F.2d at 1416.

Neither the fact of the inventor's knowledge of the 4540 nor the existence of the Gunter photographs was ever brought to the attention of the PTO Examiner prior to the issuance of the patent in suit. Broyhill's defense is that since Fitzpatrick failed to explain to Huffstetler his duty under 37 C.F.R. § 1.56, that since Huffstetler did not understand nor inquire about his duty to disclose all relevant prior art and prior art printed publications when he signed the oath on the application, and that since Mr. Beach, the liaison, knew of the duty but did nothing, there is no violation of the duty of candor under 37 C.F.R. § 1.56. As Huffstetler testified, Beach merely handed the application over to him and asked that Huffstetler sign the application's oath. The court is of the opinion that Broyhill's conduct exhibits gross negligence, if not a deliberate course of conduct indicating an intent to mislead the PTO or to conceal relevant information which the court considers highly material.

The court finds that Fitzpatrick was grossly negligent in failing to discuss with Huffstetler, Beach, or any other official or employee at Broyhill their knowledge of relevant prior art. Neither before filing the application nor before filing the Petition to Make Special did Fitzpatrick discuss the invention directly with Huffstetler, Beach, Gunter or others involved in the application with any semblance of an attempt to determine the relevant facts about the invention's origin or the inventor's knowledge of the relevant prior art.

Interestingly, Fitzpatrick testified that with Interco's utility patents he made a practice of regularly visiting with the inventor, prior to filing the application, to determine the inventorship, the best and most relevant prior art, and any other knowledge of the inventor. Fitzpatrick's only explanation as to why he did not follow this procedure with Huffstetler was his opinion that design patents were "so sim-

ple" or "so easy" that such consultation was not necessary. Fitzpatrick also made much of his reliance on the fact that he "assumed" Broyhill personnel knew what to do with regard to patent matters, although Fitzpatrick made no effort to confirm his assumption by asking the principal parties involved in the patent application whether in fact they *did* understand the implications of their oaths and the extent of their duty of disclosure to the PTO. In this connection, Fitzpatrick failed to determine whether Gunter, Beach or Huffstetler had ever been personally involved with any prior Broyhill patent application. Fitzpatrick's gross neglect in failing to inquire about these individuals' knowledge of proper patent acquisition procedures is particularly striking in light of Broyhill's past reliance on outside counsel for advice and assistance with patent applications, a fact admittedly known to Fitzpatrick.

Fitzpatrick also admitted to using an out-of-date edition of the MPEP, even though Broyhill's own patent law expert, Mr. Shefte, testified that he would always keep an up-to-date MPEP because it is such a useful tool to him in preparing patent applications. Shefte also testified that the prudent course of action is to disclose to the PTO Examiner any "doubtful" prior art and to allow the examiner to decide on materiality.

The Federal Circuit Court of Appeals has recently stated:

No single factor or combination of factors can be said always to *require* an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith" sufficient to prevent the drawing of an inference of intent to mislead. A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.

*FMC Corp., supra,* 835 F.2d at 1416. The court finds that the plaintiffs have shown by clear and convincing evidence that the Gunter photographs and the Benchcraft 4540 are both material prior art and that Huffstetler and other Broyhill personnel had knowledge of this prior art and of its materiality to the patented design. Defendant's failure to disclose this prior art either to Fitzpatrick or to the PTO leads the court to conclude that the plaintiffs have proven an intent to mislead the PTO.

Based on the foregoing acts, the court finds that Fitzpatrick, Gunter, Beach, and Huffstetler, as persons "substantively involved in the preparation or prosecution of the application and who [are] associated with the inventor", 37 C.F.R. § 1.56(a), violated their duty of candor and good faith toward the PTO and were grossly negligent in the following respects:

(1) Fitzpatrick's use of an outdated MPEP in his dealings with the PTO, in preparing and filing the Petition to Make Special, and in his overall negligent and careless conduct in obtaining the patent in suit, knowing of Broyhill's intention to use the patent to institute litigation against its competitors.[17]

(2) Fitzpatrick's and Beach's failure to explain to Huffstetler the legal implications of the oath in the patent application signed by Huffstetler, particularly with respect to an inventor's duty to disclose to the PTO all information material and relevant to the patent application.

(3) Failure to provide to the PTO copies of the Gunter photographs, PTX–5, and failing to apprise the Examiner of the fact that the photographs could be considered prior art as the "starting point" or "inspiration" for the patented design.

(4) Fitzpatrick's representation to the PTO in connection with the Petition to Make Special that a "thorough" prior art search had been conducted, when in fact only an inexpensive, cursory search had

---

**17.** Another fact which argues in favor of an inference of an intent to mislead the PTO on the part of Broyhill is the timing of Fitzpatrick's receipt of all information related to the invention, PTX–8. Fitzpatrick did not request a full and complete disclosure from Huffstetler until *after* the patent had issued and only in contemplation of litigation against the alleged infringers of the patent.

been conducted in the offices of the PTO and no search of the pertinent catalog and literature files at the PTO nor of the prior art files of the inventor had been conducted.

(5) Fitzpatrick's failure to determine whether Broyhill had sold furniture styles, e.g., PTX–26 and PTX–18, with "country" features which might be considered prior art to the design of the patent in suit.

(6) Huffstetler's failure to disclose to the PTO his knowledge of the Benchcraft 4540 prior to the filing of his patent application when he considered the 4540 a "knockoff" of the design.

## V. PATENT INFRINGEMENT

The court having concluded that the patentee was guilty of inequitable conduct, the patent must be declared invalid and unenforceable. *J.P. Stevens, supra,* at 1560. Accordingly, the court finds that there can be no claim for infringement of the patent. The court makes no factual findings as to the infringing nature of the plaintiffs' copies of the patented design nor as to the willful or deliberate nature of the alleged infringement.

Since none of the plaintiffs ever admitted or recognized that a valid patent existed, but rather challenged the validity of same *ab initio,* the court finds that any inquiry as to the willful or deliberate nature of plaintiffs' conduct is unnecessary and irrelevant. Plaintiffs timely brought this action to have the patent declared invalid promptly upon learning that the patent had issued. There can be no finding of infringement on the part of the plaintiffs with respect to their actions taken before the patent issued.

Each plaintiff commenced development and production of its accused style without notice of any patent rights by Broyhill. Broyhill's pieces bore no patent marking or "patent pending" notice on the 7660 group. In the case of Riverside, outside designers were responsible for developing the 9553 style. Management of each of the plaintiff manufacturers had considerable experience in furniture design at the time the patent application was filed and at the time the patent issued. Messrs. Corson and Waxman of Crestline, Udouj of Riverside, and McLarty of Benchcraft all testified that they were highly skeptical of the patentability of the patented design, based on their extensive experience in the history and development of furniture design.

The plaintiffs considered the design not to be significantly different from various prior art designs. The management of the plaintiffs also learned that the inspiration of the '485 patent design had been obtained by Broyhill in Europe and formed the opinion that the "derived" origin of the patent rendered it invalid. In view of the foregoing, the court finds that the plaintiffs acted reasonably in analyzing the validity of the patent in suit and in reaching a good faith belief that the claim was invalid either for obvious reasons or failure to disclose derivative prior art.

## VI. DAMAGES

The court finds that Broyhill is not entitled to an award of damages because its patent was obtained through inequitable conduct and has been declared invalid and unenforceable. Since no damages are dictated by the court's ultimate result herein, the court offers no advisory opinion regarding whether a royalty or lost profits would have been due Broyhill, had Broyhill been entitled to recover damages.

## VII. EXCEPTIONAL CASE

Plaintiffs seek an award of attorney's fees under 35 U.S.C. § 285, which requires a finding that this action is an "exceptional case". The kind of "exceptional circumstances" required to justify an award of attorney's fees include inequitable conduct in the prosecution of a patent, misconduct during litigation, vexatious or frivolous litigation, fraud or bad faith on the part of patentee or infringer. *See Interpart Corp. v. Italia,* 777 F.2d 678 (Fed.Cir.1985); *Reactive Metals and Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578 (Fed.Cir.1985); *Pennwalt Corp. v. Akzona, Inc.,* 740 F.2d 1573 (Fed.Cir.1984).

Even assuming that one of the above-noted instances of "exceptional circumstances" has been proven, the prevailing party is not entitled to attorney's fees automatically. The decision to grant attorney's fees is committed to the sound discretion of the court. *Korody–Colyer Corp. v. General Motors Cop.*, 760 F.2d 1293 (Fed.Cir.1985); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613 (Fed.Cir.1985); *Campbell v. Spectrum Automation Co.*, 601 F.2d 246 (6th Cir.1979). As the Fifth Circuit has interpreted § 285, an award of attorney's fees under this statute requires an unambiguous showing of extraordinary misconduct. *Arbrook, Inc. v. American Hospital Supply Corp.*, 645 F.2d 273 (5th Cir.1981). The purpose of the award of attorney's fees permitted under a § 285 is to prevent a gross injustice to the prevailing party who has either had to initiate litigation to enforce its patent or to defend against an allegation of infringement.

In the case *sub judice,* the alleged infringers themselves brought this action to have Broyhill's patent declared invalid. During the pendency of this lawsuit, the plaintiffs have continued to sell the alleged infringing pieces of furniture. In the opinion of the court, there has been no showing that gross injustice would result if plaintiffs were denied their attorney's fees. Quite to the contrary, the court finds that there are no exceptional circumstances justifying an award of attorney's fees and that plaintiffs would be unjustly enriched if they were awarded their attorney's fees.

## CONCLUSIONS OF LAW

### I. JURISDICTION

The court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1338 and §§ 2201 and 2202. The court also holds that it has personal jurisdiction over all the parties in this action.

### II. PRESUMPTION OF VALIDITY

Under 35 U.S.C. § 282, a patent is presumed valid and the court must give deference to the decision of the PTO granting the patent. Section 282 provides:

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of established invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

With regard to design patents, 35 U.S.C. § 171 provides:

Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefore, subject to the conditions and requirements of this title.

The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided.

The presumption of validity can only be overcome by clear and convincing evidence of invalidity, *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985), and the burden of proof rests squarely on the party asserting invalidity. *Jones v. Hardy,* 727 F.2d 1524, 1528 (Fed.Cir.1984). The approach the court must take in viewing an attacker's challenge to the validity of a patent was set forth plainly by the Federal Circuit:

To summarize on this point, § 282 creates a presumption that a patent is valid and imposes the burden of proving invalidity on the attacker. That burden is constant and never changes and is to convince the court of invalidity by clear evidence. Deference is due the Patent and Trademark Office decision to issue the patent with respect to evidence bearing on validity which it considered but *no such deference is due with respect to evidence it did not consider.* All evidence bearing on the validity issue, whether considered by the PTO or not, is to be taken into account by the tribunal in which validity is attacked. (emphasis added)

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.

1984), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

Patentability, or validity of an issued patent, depends upon novelty, as set forth in 35 U.S.C. § 101, lack of anticipation as set forth in 35 U.S.C. § 102 and non-obviousness, as set forth in 35 U.S.C. § 103. For the court to determine that novelty does not exist, it must find that each element of the claim under consideration was disclosed in a single prior art reference. *FMC Corp., supra; W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1554 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

Although the plaintiffs had argued at the pretrial stage of this lawsuit that the patent in suit was not for a patentable item, at trial they abandoned this theory. Plaintiffs have also abandoned their anticipation argument. Accordingly, the court concludes that lack of novelty and anticipation of the patented design under § 101 and § 102 are no longer at issue in this case. On the other hand, there still remains the question of obviousness of the patented design, and under 35 U.S.C. § 103, this requires an extensive evaluation of the prior art. For although an invention is not anticipated under § 102 and is novel under § 101, a patent should not issue if the differences between the prior art and the claimed invention as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103; *Graham v. John Deere Co., supra.* The precise language of § 103 reads as follows:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

## III. OBVIOUSNESS

Whether a patent is obvious is a question of law. *Graham v. John Deere Co., supra,* 383 U.S. at 17, 86 S.Ct. at 693, 15 L.Ed.2d at 556; *Petersen Mfg. Co. v. Central Purchasing Co., supra,* at 1548. A party asserting that a patent is invalid for obviousness has the burden of proving his assertion by clear and convincing evidence. *Railroad Dynamics v. Stucki Co.,* 727 F.2d 1506, 1511, 1517 (Fed.Cir.1984), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). This burden is lessened when material prior art was not cited to nor examined by the PTO examiner in the prosecution of the patent application. *Id.*

In ruling on obviousness, the court should first make certain factual inquiries, including: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; ·(3) the level of ordinary skill in the art; and (4) so-called "secondary considerations" such as commercial success, long felt but unsolved needs, and failure of others. *Graham* 383 U.S. at 17, 86 S.Ct. at 693, 15 L.Ed.2d at 556; *Atlas Powder Co. v. E.I. DuPont de Nemours & Co.,* 750 F.2d 1569, 1574 (Fed.Cir.1984).

■ It is critical to any proper resolution of the obviousness issue that the court focus solely on the facts and circumstances existing at the time the invention was made, not at any later time. As the Federal Circuit stated in the case of *Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1443 (Fed.Cir.1984):

To imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art reference or references of record convey or suggest that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against the teacher.

It is difficult but necessary that the decision-maker forget what he or she has been taught at trial about the claimed invention and cast the mind back to the time the invention was made ... to occupy the mind of one skilled in the art who

is presented only with the references, and who is normally guided by the then-accepted wisdom of the art....

See also, *Cable Elec. Products, Inc. v. Genmark, Inc.,* 770 F.2d 1015 (Fed.Cir. 1985).

■ Additionally, the court's analysis in the decisional process en route to a § 103 conclusion begins with consideration of what is actually claimed as the invention, since the court must view the claimed invention as a whole to make a determination on the obviousness of the subject matter. 35 U.S.C. § 103. In a design patent, the claimed invention is the ornamental appearance of the article(s) shown in the patent drawings. As stated in the patent in suit, the claim is for: "The ornamental design for a seat, as shown and described." PTX-1. Evaluation of the design as a whole, however, necessarily involves piecemeal consideration of the claimed distinguishing features of the patented design.

In assessing the obviousness of the patent in suit, the court has considered all of the factual evidence presented, including the expert opinions offered by each party, giving said expert opinion testimony such weight as the court deems appropriate. *See Ashland Oil, Inc. v. Delta Resins & Refractories,* 776 F.2d 281 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986).

### A. Scope and Content of the Prior Art

■ The court has set forth in its findings of fact, *supra,* a discussion and listing of the prior art which the court concludes is relevant to the patent in suit. The court is also called upon at this juncture to make a legal conclusion regarding whether the Benchcraft 4540 sofa and the Zampa Venezia photographs are prior art under 35 U.S.C. § 102. The Benchcraft 4540 was placed on the market for sale in the Spring of 1982, more than one year prior to the filing of the application for the patent in suit. The court, therefore, concludes as a matter of law that the Benchcraft 4540 is prior art under 35 U.S.C. § 102(a) and § 102(b).

■ A photograph by itself may constitute a "printed publication" for purposes of 35 U.S.C. § 102. *Universal Athletic Sales Co. v. American Gym,* 546 F.2d 530, 543 n. 45 (3d Cir.1976), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977). All that is contemplated under § 102 for an item to qualify as a printed publication is that it be a document printed, reproduced, or duplicated by modern day methods, including photography, upon a satisfactory showing that such document has been disseminated or otherwise made available to the public at least to the extent that persons interested in the art can locate the document and recognize the essentials of the claimed invention. *In re Wyer,* 655 F.2d 221, 226 (C.C.P.A.1981). Limited dissemination of the document, standing alone, does not require a finding that the matter is not a printed publication under § 102. *See* note 9, *supra.* So long as the publication reaches members of the trade interested in the subject matter, it may be found to constitute a printed publication:

While it is true that the phrase, "printed publication", presupposes enough currency to make the work part of the possession of the art, it demands no more. A single copy in a library, though more permanent, is far less fitted to inform the craft than a catalogue freely circulated, however ephemeral its existence; for the catalogue goes direct to those whose interests make them likely to observe and remember whatever it may contain that is new and useful.

*Jockmus v. Leviton,* 28 F.2d 812, 813–814 (2d Cir.1928).

Broyhill argues that there is insufficient proof to qualify the Zampa Venezia ad slick photograph, PTX-9, as printed publication prior art. In this vein, Broyhill argues that since all the evidence presented on the issues of dissemination, accessibility, and availability of the photograph was oral, plaintiffs' argument must fail. The court, however, has found that oral testimony can be sufficient if it is strong, clear and convincing as to the issues in question and is corroborated by contemporaneous correspondence or other dated records. *See su-*

*pra,* at 1199; *Galland–Henning Mfg. Co., supra.*

The court holds that Zampa's oral testimony is credible and convincing and is corroborated by the testimony of Spicer and by Spicer's contemporaneous written records. There has also been no showing of any evidence that either Zampa or Spicer have any "demonstrated financial interest in the outcome of th[is] litigation...." *Stevenson v. International Trade Commission,* 612 F.2d 546, 550 (C.C.P.A.1979). The court, therefore, concludes that the plaintiffs have established that the Zampa Venezia photograph, PTX–9, is a printed publication under § 102(a) and § 102(b).

█ As the court has heretofore indicated in its findings of fact, the scope and content of the prior art relevant to the patent in suit includes various sofas of different designs, each incorporating one or more of the design features of the patent design. The only notable element of the patented design missing from the prior art is the shirred kidney roll on a country piece of furniture. As the court has found, however, the shirred kidney roll was known in the industry and had been seen on contemporary or traditional pieces prior to the invention of the patented design.

## B. Differences Between the Claimed Invention and the Prior Art

The primary differences between the patented design and the prior art are set forth above from the testimony of Professor Foote. *See supra,* note 13. On the whole, the court holds that the primary difference between the claim of the patent and the prior art lies in the shirred kidney roll, since every other aspect of the design was known in the industry prior to the invention. Even the shirred kidney roll is not clearly set forth in the general language of the claim. Nevertheless, having considered the testimony of Mr. Gunter that the design "dictates" the need for a certain fabric treatment, the court holds that the shirred kidney roll effect can be found to be within the claim of the patent.

In reviewing the prior art, not all items of prior art may be combined to determine obviousness. Rather, the test for whether references may be combined in determining obviousness is "whether they are so related that the appearance of certain ornamental features in one would suggest the application of those features to the other." *In re Rosen,* 673 F.2d 388, 391 (C.C.P.A.1982). More succinctly, "the proper test is whether the references, taken as a whole, would suggest the invention to one of ordinary skill in the art." *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1581–82 (Fed.Cir.1983). This test requires the court to consider whether the differences between the claimed invention and the prior art are so *de minimis* as to negate any invention.

In distinguishing the claimed invention from the prior art, the court may not simply take the individual elements of the patented design, item by item, and try to find whether they exist somewhere in the prior art. *Litton Systems, supra,* at 1443. The court is limited to consideration of the claimed invention as a whole:

> In considering patentability of a proposed design the appearance of the design must be viewed as a whole, as shown by the drawing, or drawings, and compared with something in existence— not with something which might be brought into existence by selecting individual features from prior art and combining them, particularly where combining them would require modification of every individual feature.

*In re Rosen, supra,* at 391 (citing *Application of Jennings,* 182 F.2d 207, 208, 37 CCPA 1023 (1950)). There must be particular reference, the design characteristics of which are basically the same as the patented design. That single reference may then be combined with modifications suggested by secondary references. The modification necessary to the primary reference in order to achieve the patented design may not destroy fundamental characteristics of the primary reference. *Id.* at 391.

Although plaintiffs made a concerted effort to show that the combination of the Benchcraft 4540 and the Zampa Venezia sofa was suggested by the references

themselves, the court holds otherwise. As Professor Foote testified, there is nothing in the 4540 or the Venezia sofa which would impliedly or expressly suggest combination of the two references. Furthermore, combination of either reference with the other would undoubtedly destroy the fundamental characteristics of the primary reference. The Zampa Venezia would require a complete change in proportions from European scale to American scale and from Victorian to country style, thereby substantially altering the overall aesthetic appearance of the Venezia piece. Likewise, to graft on to the Benchcraft 4540 the Victorian style back of the Venezia sofa would give the 4540 a much more formal look, substantially changing its overall appearance. This is not to suggest that the 4540 and the Venezia photograph and sofa are not highly material prior art. The court is convinced that these two references formed the derivative "starting point" for Huffstetler's patented design. The court is not convinced, however, that the differences between these prior art references and the claimed invention are *de minimis* in nature.

### C. Level of Ordinary Skill in the Art

As developed more fully in its findings of fact above, the court holds that the person of ordinary skill in the art of furniture design would possess at least a high school education and some minimal level of training or experience in the art of design, together with at least a modicum of artistic aptitude. While consideration of the prior art references, standing alone, would not suggest to the person of ordinary skill any combination thereof, the court holds that given the description from Gunter and Kepley, their request for a "version" of the European sofa they had seen, and access to the Gunter photographs, the person of ordinary skill in the art might have created the patented design. The court is not prepared to hold, however, that Gunter's and Kepley's oral descriptions to Huffstetler—made known only to Huffstetler and Stuenkel—rose to the level of prior art. Rather, Gunter's and Kepley's descriptions of the Venezia suite, based on a piece of

prior art, are more probative on the issue of inequitable conduct than on the issue of obviousness. Thus, the court holds that the overall design claimed in the patent would not be obvious to the person of ordinary skill in the art.

### D. Secondary Considerations

In reaching its ultimate conclusion on the issue of obviousness, the court is required to ascertain the presence of any objective indicia of non-obviousness. *Panduit Corp. v. Dennis Mfg. Co.*, 810 F.2d 1561, 1569 (Fed.Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). These objective indicia include commercial success, failure of others, long-felt but unresolved need, and copying of the invention in preference to the prior art. *Id.*

#### 1. *Commercial Success*

In order for commercial success to serve as a reliable indicator of non-obviousness, the commercial success must be attributable to the design or ornamental appearance of the invention rather than to a need in the marketplace fulfilled by the functional or non-design aspects of the underlying items to which the design is applied. *Peterson Mfg. Co.,* 740 F.2d at 1549; *In re Nalbandian,* 661 F.2d 1214, 1218 (C.C.P.A.1981). There must be some nexus between the ornamental features of the design and the commercial success of the design: "To be of value, evidence of commercial success must clearly establish that the commercial success is attributable to the design, and not to some other factor...." *Litton Systems, Inc.,* 728 F.2d at 1443. The court has found that the commercial success of the patented design was and is attributable to several non-design factors, including fabric application, price, and wood treatment. Accordingly, the court concludes that this is a case where commercial success, without more, is not a reliable indicia of non-obviousness of the design.

#### 2. *Long-felt but Unresolved Need and Failure of Others*

As the court has already noted, the court concludes that this furniture design case is

not an appropriate instance for consideration of long-felt but unresolved need or failure of others as indicia of non-obviousness. No evidence on either of these factors was adduced at trial to show either the efforts or the failure of others who have employed similar designs in their furniture to correct any "problem" which the patented design solved. One court has eloquently stated the difficulty in applying these criteria to a design patent case:

> Since the design patent covers only optional aesthetic features, there is never a long felt need or an unsuccessful search, and it is rarely possible to allocate the specific portions of the profits on a commercial product which are respectively attributable to its utilitarian advantages and to its visual appeal. Thus, in the final analysis, the court's evaluation of a design is essentially subjective and personal artistic tastes are unpredictable and inexplicable—one viewer's mural is another's graffiti.

*Plantronics, Inc.*, 403 F.Supp. at 159–160.

### 3. *Copying by Others*

Broyhill asserts that the evidence of copying of the patented design along with the demonstrated commercial success of the design clearly shows that the design was non-obvious. As the court has found, the design of the patent in suit has been copied by at least eighteen (18) furniture manufacturers in addition to plaintiffs Benchcraft and Crestline. Copying of a design is perhaps one of the most probative and compelling arguments that the design is novel and unique. As the Fifth Circuit has stated on the question of copying:

> The imitation of a thing patented by the defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think.

*Sel–O–Rak Corp. v. Henry Hanger & Display Fix. Corp.*, 232 F.2d 176, 179 (5th Cir.), *cert. denied*, 352 U.S. 870, 77 S.Ct. 95, 1 L.Ed.2d 76 (1956) (*citing Kurtz v. Belle Hat Lining Co.*, 280 F. 277, 281 (2d Cir. 1922)).

Having considered all the relevant *Graham* criteria, the court concludes that insofar as obviousness is concerned, the patent in suit is valid, claiming as it does a design which is novel and which, when compared to the prior art, would not have been obvious to a person having ordinary skill in the art at the time the invention was made.

## IV. DERIVATION

Plaintiffs also argue that Huffstetler did not invent any new, original and ornamental design but instead derived the patented design from the Gunter photographs. This derivation argument is tied to the language of 35 U.S.C. § 102(f), which provides that: "A person shall be entitled to a patent unless he did not himself invent the subject matter sought to be patented...."

In order to prevail on this theory, plaintiffs must be able to establish that the Gunter photographs depict a design which is identical to the patent in suit. Plaintiffs also must show that Huffstetler saw the Gunter photographs before he developed his design. *See Amax Fly Ash Corp. v. United States*, 514 F.2d 1041, 206 Ct.Cl. 756 (1975).

The court has considered plaintiffs' evidence on the derivation of the patented design from the prior art references, namely the Benchcraft 4540 and the Zampa Venezia which Huffstetler viewed in the Gunter photographs. Huffstetler himself admitted that the Gunter photographs comprised the "inspiration" for his design and that he used the photographs to "verify and clarify" certain aspects of his design. Thus, plaintiffs have proven at least half of their derivation theory. Based on the court's factual findings set forth above, however, the plaintiffs have failed to establish that the Gunter photographs disclose each and every element of the patented design. *Carella v. Starlight Archery and Pro Line Co.*, 804 F.2d 135, 139 (Fed.Cir. 1986).

On the issue of derivation *vel non*, the court holds that plaintiffs have failed to carry their burden of proof.

## V. INEQUITABLE CONDUCT

The third ground plaintiffs raise for invalidity or unenforceability of the patent in suit is that Broyhill withheld material prior art from the PTO in prosecuting its application for the patent in suit, thereby committing inequitable conduct, or fraud before the PTO. This claim of patent unenforceability must be proven by clear and convincing evidence and the party asserting the claim or defense "carries a heavy burden" in this connection. *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir. 1983).

Generally, common law fraud requires that: 1) a misrepresentation of a material fact be made with intent to deceive or a state of mind so reckless respecting the consequence of the misrepresentation as to be the equivalent of intent; 2) justifiable reliance on the misrepresentation by the party deceived thereby inducing him to act; and, 3) injury to the party deceived as a result of the reliance on the misrepresentation. *Norton v. Curtiss,* 433 F.2d 779, 793, 57 CCPA 1384 (1970). In prosecuting a patent before the PTO, conduct which may render a patent unenforceable is broader than that which constitutes common law fraud. *Id.* at 793. Such conduct which may render a patent unenforceable includes either failure to disclose material information to the PTO or submission of false material information with an intent to mislead. *J.P. Stevens & Co., supra,* at 1559. The Federal Circuit has characterized this type of conduct which may occur in the prosecution of a patent application as "inequitable conduct." This characterization is used in lieu of the term "fraud" in order to clarify the extent of the conduct which may render a patent unenforceable: inequitable conduct encompasses both affirmative acts of commission as well as grossly negligent acts of omission. *Id.*

To prove inequitable conduct, plaintiffs here must prove: 1) an act of misrepresentation, 2) which was material, 3) involving information that was known or should have been known to the patentee, and 4) which was committed with the requisite intent. *N.V. Akzo v. E.I. DuPont de Nemours,* 810 F.2d 1148, 1153 (Fed.Cir.1987) (citing *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693, 698 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984)). In the case of *N.V. Akzo, supra,* the Federal Circuit set forth a balancing test which the court should apply in ruling on the issue of inequitable conduct:

> The elements of materiality and intent must be determined separately and then weighed together to ascertain whether the patentee engaged in inequitable conduct. The tribunal must then carefully balance the materiality and intent: the less material the proffered or withheld information, the greater the degree of intent that must be proven. In contrast, a lesser degree of intent must be proven when the information has a great degree of materiality.

*Id.* at 1153. This balancing approach was recently reaffirmed by the Federal Circuit in the case of *FMC Corp. v. Manitowoc Co., Inc., supra,* 835 F.2d at 1414–1417.

### A. Materiality

A finding of inequitable conduct requires proof by clear and convincing evidence of a threshold degree of materiality of the non-disclosed information. *Carella, supra,* 804 F.2d at 140; *Atlas Powder Co., supra,* 750 F.2d at 1577–78. For the purposes of its decision here, the court adopts the materiality standard set forth at 37 C.F.R. § 1.56(a), i.e., "material" meaning all information where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *Id.* The more demanding "but for" tests, in the opinion of the court, need not be applied in the case *sub judice* for the court to reach its conclusion that Broyhill committed inequitable conduct before the PTO. As the Federal Circuit has ruled: "In determining the inequitable conduct issue, a district court need not make explicit findings on whether undisclosed art anticipates the claimed invention or whether it would have rendered the claimed invention obvious under § 103...." *Gardco Mfg.,*

*Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1214 (Fed.Cir.1987).

On the issue of materiality, the court finds that the Gunter photographs of the Zampa Venezia sofa and the Benchcraft 4540 sofa are both highly material prior art which Huffstetler or Fitzpatrick should have disclosed to the PTO. With regard to the Gunter photographs, Huffstetler admitted knowledge of the photographs prior to the completion of his design and even characterized the photographs as the "inspiration" for his design. This reference is, in the opinion of the court, clearly more material to the patented design than the prior art disclosed in PTX–2.

Huffstetler himself also admitted that he considered the photographs material to his design, even though he made said statement without benefit of a thorough legal explanation of the proper interpretation of the term "material". Huffstetler's understanding of the term "material" to mean anything which would have given him an idea of a design element is, in the opinion of the court, closely analogous to the standard set forth in the PTO definition. *See* 37 C.F.R. § 1.56(a). Undoubtedly, if the Gunter photographs contained inspirational or formative aspects of Huffstetler's ultimate design, then a PTO examiner would consider the photographs to be important in deciding whether to grant the patent. The court holds that the Gunter photographs, although they depict an overall design different from much of the prior art cited to the PTO, do closely resemble at least the back portion of the patented design, would not constitute cumulative prior art references, and should have been disclosed to the PTO.

Using the same analysis as that applied to the Gunter photographs, the court also concludes that the Benchcraft 4540 is material prior art of which the inventor, Huffstetler, had knowledge prior to the filing of his patent application. Huffstetler characterized the overall silhouette of the 4540 sofa as a "knockoff" of his own design. Considering the close similarity between the exposed wood rail seen on the 4540 and the "continuous wood rail" described as a distinguishing feature of the patented design by Fitzpatrick in Amendment A, the court concludes that the 4540 is highly material prior art. Upon a cursory review of his own files, Huffstetler should have known that the 4540 predated his own design and that it was material to his patented design. *See FMC Corp., supra,* 835 F.2d at 1415–1416. The court holds that this reference also meets the definition of material promulgated by the PTO. 37 C.F.R. § 1.56(a).

### B. Intent

Inequitable conduct also requires clear and convincing proof of a threshold intent. The intent need not be proved with direct evidence but may be shown by acts, the natural consequences of which are presumably intended by the actor. Proof of deliberate scheming is not necessary, a showing of gross negligence is sufficient. *Rohm & Haas Co. v. Crystal Chemical Co.,* 722 F.2d 1556, 1571 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed. 2d 107 (1984). As noted in the court's findings of fact, *supra,* gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of the withheld reference. *J.P. Stevens, supra,* at 1560.

The Federal Circuit has indicated that "a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead...." *FMC Corp, supra,* 835 F.2d at 1416.

In the case at bar, the court has concluded that the prior art not disclosed by Broyhill rises to a high level of materiality, requiring a persuasive showing of "subjective good faith" on the part of Broyhill. No such showing has been made on the record before the court. The primary argument Broyhill advances for its failure to disclose the Gunter photographs or the Benchcraft 4540 to the PTO is that its patent attorney, Fitzpatrick, did not have knowledge of these references and the inventor, Huffstetler, did not fully ap-

preciate the materiality of the references. This argument places Fitzpatrick and Huffstetler in the position of making a determination which the PTO examiner should have made: whether these references would be important to the examiner in allowing the application to issue as a patent. As Mr. Shefte, Broyhill's own patent law expert, testified, any doubts regarding the materiality of a prior art reference should be left for resolution by the examiner.

The court also notes that it appears from the proof that the intent of Broyhill's personnel—namely Messrs. Gunter and Kepley, who went to England and photographed the Zampa Venezia sofa and later described it to Huffstetler—was to deliberately withhold knowledge of the photographs and the subject of the photographs from both their own patent attorney and the PTO. Gunter and Kepley placed the photographs in the hands of Huffstetler, the named inventor on the patent application, with knowledge or reason to know that those photographs were material to the resulting design sought to be patented. Failure to disclose the existence of the photographs to either Fitzpatrick or the PTO during the prosecution of the patent application leads the court to conclude that there existed an intent to mislead the PTO by failing to produce an extremely material prior art reference which the inventor utilized in finalizing his design.

The court holds that the withheld Gunter photographs of the Venezia sofa and the Benchcraft 4540 are prior art references highly material to the design of the patent in suit. Based on the conduct of Huffstetler and Broyhill's officers and its patent attorney, the court concludes that Broyhill's '485 patent claim is unenforceable due to the inequitable conduct of Huffstetler, Fitzpatrick and Broyhill's personnel during the pendency of the patent application before the PTO. This is a case where the scales tilt very definitely toward the conclusion that inequitable conduct has occurred. *J.P. Stevens, supra,* at 1560.

Fitzpatrick was grossly negligent in failing to conduct a careful and thorough search of the prior art, in failing to conduct an interview directly with the inventor, and in failing to learn of the existence of the Gunter photographs which were known to the inventor and were highly material to the development of the design of the patent in suit.[18] The court declares that the '485 patent is invalid and unenforceable due to the inequitable conduct committed before the PTO.

## VI. INFRINGEMENT

Since the court has ruled that the patent in suit is rendered invalid and unenforceable due to the inequitable conduct of Broyhill before the PTO, the court finds that there can be no infringement of the patent. The plaintiffs never conceded the validity of the patent in suit and acted promptly upon their opinion once the patent issued. There was no deliberate or dilatory action on the part of the plaintiffs.

## VII. DAMAGES

The court has ruled that Broyhill's patent is invalid and unenforceable. Accordingly, Broyhill is not entitled to any award of damages.

## VIII. EXCEPTIONAL CASE

Based on the totality of the circumstances presented in this case, the court concludes that this case is not an "exceptional" one justifying an award of attorney's fees in favor of the plaintiffs. *See* 35 U.S.C. § 285. In reaching this decision, the court notes that the issues in this case were extremely close and that each party was reasonably entitled to rely upon the arguments it advanced at trial. Although plaintiffs have succeeded in invalidating Broyhill's patent, the court notes that Section 285 "does not contemplate that a prevailing alleged infringer should be treated as a 'private attorney general' for invalidating a 'fraudulent' patent." *J.P. Stevens*

---

**18.** In this connection, the court notes that Gunter, Kepley, Huffstetler, and Fitzpatrick all acted as agents of Broyhill. Thus, notwithstanding the actual knowledge each actor possessed, it would be appropriate to impute the knowledge of one to all.

*Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1052 (Fed.Cir.1987).

As noted in the court's findings of fact, *supra,* there has been no showing of *extraordinary* misconduct such as to justify an award of attorney's fees in this case. *See Arbrook, Inc., supra,* 645 F.2d at 279. The purpose of Section 285 "is to provide discretion where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear." *J.P. Stevens,* 822 F.2d at 1052. The court finds that it would not be grossly unjust to these plaintiffs to deny them an award of attorney's fees in this cause.

## IX. CONCLUSION

Based on the foregoing, the court concludes that the '485 patent is invalid and unenforceable due to inequitable conduct before the Patent and Trademark Office. Because the patent is invalid, plaintiffs have not infringed it. Thus, Broyhill is not entitled to an award of damages. Consideration of the totality of the circumstances in this case leads the court to conclude that there are no "exceptional circumstances" justifying an award of attorney's fees to plaintiffs in this cause.

A separate judgment shall this day issue pursuant to Rule 58 of the Federal Rules of Civil Procedure.

## JUDGMENT

Pursuant to a memorandum opinion this day entered, it is ordered and adjudged as follows:

(1) Judgment is hereby entered in favor of the plaintiffs and counter-defendants Benchcraft, Inc., Riverside Furniture Corporation, and Hickory Hill Furniture Company, a/k/a Crestline Furniture Company. The court holds that U.S. Patent Des. No. 274,485 is invalid and unenforceable due to inequitable conduct before the U.S. Patent and Trademark Office.

(2) There is no award of attorney's fees and expenses in the case *sub judice* as this court does not find the case to be an "ex-ceptional case" as defined in 35 U.S.C. § 285.

(3) The court costs are assessed to the defendant and cross-plaintiff Broyhill Furniture Industries, Inc.